# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

February 2, 2023

**VIA ECF**
Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street, Room 2260
New York, New York 10007

Re:     **United States v. Maurice Hicks**
        **21 Cr. 674 (GHW)**

Dear Judge Woods:

For the past thirteen years, Maurice Hicks has suffered from severe and repeated seizures, which, at times, totaled twenty in a single month.  Mr. Hicks' neurologists have prescribed a variety of different medications to treat the seizures; at times they were successful and, at other times, they were not.  Despite taking seizure medications, Mr. Hicks is currently suffering from an increase in seizures, which often result in a loss of consciousness and has even led to severe burn injuries in the past.   As his neurologist Dr. Dmitriy Grinshpun opines, a term of incarceration would "severely aggravate" Mr. Hicks' seizure disorder and compromise his safety and wellbeing.

Since his arrest a year and a half ago, Mr. Hicks has flawlessly complied with the terms of his pretrial release.  During this time, Mr. Hicks has been living in the Bronx with his partner, Angelique Polanco, and has been working to manage his seizures as well as address his physical therapy needs resulting from a recent car accident.  While Mr. Hicks has currently been unable to work due to his physical condition and ailments, he hopes to improve his health to return to his longtime passion and profession as a physical trainer.  In light of Mr. Hicks' serious medical condition and his compliance on pretrial release, the defense respectfully requests that the Court sentence Mr. Hicks' to a nonincarceratory sentence.

## Background

Mr. Hicks was born on February 7, 1979 in New York to Stefanie Hicks and Maurice Liebert, who were only, at the time, 15 and 16 years old, respectively.  From birth, Mr. Hicks faced difficult circumstances.  Soon after Mr. Hicks' birth, his parents separated and he was raised in Harlem by his single 15-year-old mother, who had difficulty managing the stressors of

day-to-day life.  Living under poor economic conditions while still a teenager herself and raising a child on her own, Mr. Hick's mother often resorted to physical abuse as a means of disciplining Mr. Hicks.  Indeed, Mr. Hicks was often beat with an extension cord or a typewriter cord.  While Mr. Hicks now understands that his mother was doing the best she could when she was raising a child when she herself was still a child, it did negatively impact their relationship for many years.

Mr. Hicks also grew increasingly resentful of his mother for the many years she prevented him from seeing his father, who tried to play an active role in Mr. Hicks' life.  As such, Mr. Hicks would often sneak out of his mother's home to visit his father at his paternal grandmother's home.  At 18 years old, after an argument with his mother, Mr. Hicks was kicked out of his home and moved in with his father.  It was during this time that Mr. Hicks was able to get to know the other side of his family, including his half-siblings, that his mother had precluded him from seeing.  Although this time was rife with discord on his maternal side, Mr. Hicks feels fortunate to have had the opportunity to develop relationships with his paternal half-siblings that he maintains to this day.  While residing with his father, Mr. Hicks' mother continued to ask him to return to live with her; however, Mr. Hicks, who was still traumatized by the years of abuse, refused and moved in with his maternal grandmother instead.

Although Mr. Hicks faced trauma at home, he used athletics as an outlet.  Specifically, Mr. Hicks was particularly gifted in football, baseball, and gymnastics.  While Mr. Hicks took every opportunity to participate in athletics in whatever manner it was afforded to him, his mother was unable to pay for the training necessary in these sports to allow him to pursue them at a higher level.

Around 2002, Mr. Hicks met his current partner, Angelique Polanco, who was a single mother to her then two-year-old daughter, Brianna.  Ms. Polanco, who currently works as a care provider through Medicaid and the Administration of Children's Services, quickly took to Mr. Hicks, describing him as a "great conversationalist" and "generous and caring."  Letters of Support, attached as Exhibit B, at 1.  It did not take long before Mr. Hicks became a stepfather to her daughter, Brianna.  As Brianna explains, Mr. Hicks has always been an active and present parent in her life:  "I have so many memories of me and him running around, playing sports, and dancing around our apartment."  Ex. B at 3.  Brianna also reflects fondly on her upbringing, which she attributes to the stability of the relationship between her mother and Mr. Hicks:  "I think part of the reason I had a good childhood is because my mom and dad are like yin and yang.  They were and are a great team."  Ex. B at 3.  Although Brianna is an adult now, Mr. Hicks and Ms. Polanco remain together in a committed relationship.  Her support has been critical to Mr. Hicks throughout the years and during the course of this litigation.

In 2005, Mr. Hicks decided to channel his athleticism into a career as a personal trainer.  For a few years he worked as a personal trainer for clients at the New York Sports Club, and later as a private personal trainer.  In 2010, however, Mr. Hicks suffered a severe traumatic brain injury at the hands of several NYPD officers.  The attack caused him to be in a medically induced coma for days.  As a result of the brain trauma he sustained, Mr. Hicks suffered his first seizure in 2010.

## Medical Conditions

Mr. Hicks' traumatic brain injury eventually led to the epilepsy that he currently manages today.[1]  Since Mr. Hicks' epilepsy diagnosis, seizures have become commonplace – occurring as recently as January 30, 2023 and as frequently as fifteen to twenty times per month.  These seizures cause Mr. Hicks to lose consciousness and experience generalized shaking, tongue biting, urinary incontinence, and confusion afterwards.  Mr. Hicks' seizures are so bad that Ms. Polanco has received seizure training so she knows how to safely assist him whenever a seizure occurs.  While medications have been able to somewhat control the seizures at times, as of late, Mr. Hicks' seizures are uncontrolled.

In a letter, Mr. Hicks' neurologist, Dr. Dmitriy Grinshpun, explains that Mr. Hicks has been his patient for the past two and half years.  See Letter of Dr. Dmitriy Grinshpun, attached as Ex. C.  "Despite taking the prescribed medication," Mr. Hicks continues to experience "frequent seizures and severe symptoms of lumbar radiculopathy," causing "significant impairment with ambulation and performing activities of daily living."  Ex. C.  Mr. Hicks' "poorly controlled seizures" coupled with his "debilitating symptoms of lumbar radiculopathy," requires "continuous medical attention."  Ex. C.  Worse, in light of the stress Mr. Hicks has experienced as a result of the instant matter, it has increased the frequency and severity of his seizures.  Ex. C.  Ultimately, Dr. Grinshpun opines that "incarceration would severely aggravate Mr. Hicks' seizure disorder making it extremely difficult to manage and control; it would be detrimental to [Mr. Hick's] health, safety and overall well-being."  Ex. C.

The dangers these seizures present to Mr. Hicks have been evident.  Indeed, in April 2019, Mr. Hicks, while boiling water on his stove, suffered a seizure, causing the boiling water to fall on his arm.  As a result of this injury, Mr. Hicks suffered from second degree burns, requiring a skin graft, using skin from his thigh, to repair the damaged skin on his arm.  In addition to the numerous medical appointments and severe pain Mr. Hicks experienced as a result of this injury, it also forced him to stop working as a personal trainer as he could no longer exercise until his arm fully healed.  The impact of the burn injury took a significant toll on Mr. Hicks' physical and psychological health as Mr. Hicks was no longer able to provide for himself or maintain the level of physical fitness and athleticism that had always defined his life.

Once Mr. Hicks' skin graft healed, he then faced another setback in July 2022 when he was hit by a car as he was riding a bicycle.  This accident caused injury to his lower extremities for which he is receiving physical therapy.  Initially, the injuries made it difficult for Mr. Hicks to walk properly.  With the assistance of his physical therapists, Mr. Hicks has been able to ambulate normally again.  Nonetheless, he still requires numerous MRIs – which his providers hope can be completed once Mr. Hicks' ankle monitor is removed.

---

[1] Given the sensitive nature and quantity of medical records, the defense has not included them with the sentencing submission.  Should the Court like a copy of his medical records, the defense can provide it upon request.

**Instant Case**

As set forth in the complaint, the instant arrest was the result of Mr. Hicks' possession of a firearm after a prior felony conviction, in violation of 18 U.S.C. § 922(g).  On August 25, 2021, Mr. Hicks was arrested for carrying a gun on his person.

As Mr. Hicks expresses in his letter, he accepts full responsibility for his actions and understands the seriousness of the current situation:   "I am truly aware of my wrongdoings, and I move forward with the promise that I will never commit such offenses again."  Ex. A. He deeply regrets the lack of judgment he showed through his misconduct. He is embarrassed by his behavior and is frightened by the prospect of incarceration, especially given his serious medical conditions. He has disappointed his family and himself and will never do anything like this again.

**A Sentence of Time Served With Supervised Release is Appropriate in this Case**

Congress requires District Courts to impose a sentence that is "sufficient, but not greater than necessary . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a) (emphasis added). The Second Circuit has explained that, "[i]n deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment . . . a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." United States v. Singh, 877 F.3d 107, 121 (2d Cir. 2017) (second internal quotation marks omitted).

When determining the appropriate sentence, District Courts must consider the Federal Sentencing Guidelines, but need not abide by them. See United States v. Booker, 543 U.S. 220, 264 (2005). District Courts vary or depart from the guidelines quite frequently -- in fact, the majority of federal sentences are now outside of the guidelines range. See U.S. Sent'g Comm'n, Quarterly Sentencing Updates, available at https://www.ussc.gov/research/data-reports/quarter /quarterly-sentencing-updates. The U.S. Sentencing Commission's preliminary report for 2021 found that guidelines sentences were imposed in only 43.1% of cases nationally, and just 19.5% of cases in the Southern District of New York. See id.  This trend has been stable over the past several years.  Since 2013, SDNY judges have consistently sentenced approximately 75% of their defendants outside of the guidelines range. See id.

In this case, a downward variance is appropriate. Specifically, we respectfully request a sentence of time served plus a term of supervised release.  Such a sentence is warranted because it will account for Mr. Hick's serious medical conditions, his traumatic upbringing, his supportive family, and his success while released on pretrial supervision.

### A.  The Advisory Guidelines

Mr. Hicks has pleaded guilty to felon in possession of a weapon pursuant to a <u>Pimentel</u> letter.  Probation has found that Mr. Hicks is subject to a total offense level of 12 given his full acceptance of responsibility.  <u>See</u> PSR ¶ 26-34.  With a total criminal history score of two, Mr. Hicks falls in Criminal History Category II. PSR ¶ 45-46.  The guidelines, therefore, yield 12-18 months. PSR ¶ 87. While probation recommends a downward variance to 6 months, this variance is insufficient and remains unnecessarily punitive given Mr. Hicks' serious medical condition. PSR at p. 23.   For the reasons detailed below, the guidelines sentence and probation's recommendation for a six-month variance would be inappropriate.  <u>See</u> <u>Nelson v. United States</u>, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original).

### B.  Any term of incarceration would jeopardize Mr. Hicks' safety and wellbeing as his seizures are not under control, requiring frequent medical intervention.

Section 3553(a)(2)(D) mandates that courts consider "the need for the sentence imposed to provide the defendant with needed . . . medical care . . . in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  Here, there is no dispute that Mr. Hicks suffers from a severe and debilitating seizure condition that mandates continuous treatment.  Simply put, there is no way that the BOP will be able to treat Mr. Hicks' epilepsy were he to be incarcerated.  Indeed, even while on pretrial release, Mr. Hicks' neurologist – who has been treating Mr. Hicks for over two and a half years – is struggling to find ways to manage and control Mr. Hicks' seizures. Moreover, there are serious risks in detaining a person with uncontrolled seizures at a BOP facility.  As Mr. Hicks has already experienced through his burn injury, the loss of consciousness that accompanies Mr. Hicks' seizures poses a significant threat to his safety.

In addition to the challenges presented by his seizures, Mr. Hicks' need for physical therapy as well as MRIs as a result of his car accident militate in favor of a non-incarceratory sentence.  The BOP is not equipped to offer Mr. Hicks the necessary physical therapy and MRIs that his providers have deemed necessary to ensure that he can ambulate and otherwise move properly.  Given Mr. Hick's physical mobility issues coupled with his unmanaged seizures, the only way to ensure Mr. Hicks is provided with needed medical care "in the most effective manner" is to sentence him to time served followed by a term of supervised release.

### C.  Mr. Hicks' continued compliance with the terms of his pretrial release and curfew requirements for the past year and a half warrant a noncustodial sentence.

Since his arrest, Mr. Hicks has not only reflected on the callousness of his offense, he has also succeeded at living a law-abiding life. He has had time to think about everything he stands to lose and appreciate the importance of unfailingly abiding by the law.  As this is Mr. Hicks' first prosecution where he faces a potentially lengthy term of incarceration since his epilepsy diagnosis, he is incredibly scared of what the impact of a term of incarceration could mean for

his safety and wellbeing. Indeed, the very fact that Mr. Hicks' actions have led to potentially jeopardizing his own life were he to be detained is sufficient deterrence for Mr. Hicks.[2]

As his conformity with the terms of his pretrial release demonstrates, incarceration is not necessary to ensure Mr. Hicks' ongoing respect for the law. Per Mr. Hicks' current Pretrial Services Officer Joshua Rothman, Mr. Hicks "remains in compliance with his conditions of release." PSR ¶ 6. Specifically, "[h]e reports as directed, maintains a stable residence, and has not been rearrested for new criminal behavior." Id. In addition to his own interest in living a law-abiding life, Mr. Hicks also has the full support of his family to ensure that he remains on the right path moving forward. Mr. Hicks' compliance with pretrial services proves his ability and willingness to immediately begin complying with the terms of supervised release were the court to impose a noncustodial sentence. PSR ¶ 6.

Additionally, it is noteworthy that in the year and a half that Mr. Hicks has been on curfew restrictions, he has not asked for a single bail modification of those conditions. Mr. Hicks took seriously the conditions of his pretrial release. His flawless commitment to the terms of his curfew should thus be considered when fashioning a sentence.

### D. A non-incarceratory sentence would be consistent with other defendants' sentences in this District.

Mr. Hicks' crime was serious, and he is deeply ashamed for his actions that night. He knows guns are dangerous and has spent the last year and a half regretting his actions. He also knows this is not his first run-in with the criminal justice system, and he recognizes the need to change. That said, given his medical condition, his familial support, the fact that no one was hurt, and his overall conduct while on a lengthy period of pretrial supervision, a sentence of time served is still appropriate.

Should the Court accept the defense's recommend sentence, it would not create an unwarranted sentencing disparity. See 18 U.S.C. § 3553(a)(6). In 2020, courts in this District imposed a sentence in 61 firearm cases. Table 10, U.S.S.C., Statistical Information Packet, Fiscal Year 2020. In those cases, 52.5% of defendants were sentenced below their advisory Guideline range. Id. at Table 10. As such, a sentence below the Guideline range, including sentences of time served, would be completely in-line with District norms. See United States v. Mouzon, 16 Cr 284, ECF No. 53 (S.D.N.Y. Mar. 27, 2017) (McMahon, CJ.) (sentencing a defendant with a Guideline range of 30 to 37 months to time served (zero months in prison)); see also United States v. Nivar, 19 Cr 902, ECF No. 37 (S.D.N.Y. Jul. 29, 2021) (Torres, J.) (sentencing defendant with a Guideline range of 33 to 41 months to time served (less than six months in prison)); United States v. Figueroa, 18 Cr 293, ECF No. United States v. Garcia, 18

---

[2] See Five Things About Deterrence, Nat'l Inst. of Just. (June 5, 2016), available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence (finding, based off of empirical research, that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment" and that "prison sentences (particularly long sentences) are unlikely to deter future crime") (emphasis in original).

Cr 178, ECF No. 44 (S.D.N.Y. Apr. 17, 2019) (Ramos, J.) (sentencing defendant with a Guideline range of 24 to 30 months to time served (zero months in prison).

## **Conclusion**

Justice would not be served by giving Mr. Hicks a term of incarceration in this case. He suffers from severe and uncontrolled epilepsy that been worsening despite efforts from his medical providers to address his condition.  Although Mr. Hicks has faced difficult challenges during his pretrial release, he has been fully compliant with the conditions for the past year and a half.

As Mr. Hicks' neurologist notes, "continuous medical attention" is required for Mr. Hicks' epilepsy.  There is no doubt that the BOP will not be able to meet Mr. Hicks' constant and urgent medical needs and would only exacerbate his fragile condition.  That said, any term of incarceration would jeopardize his health and safety.

Thank you for your consideration of this request.


Very Truly Yours,

/s/ *Marisa K. Cabrera*

Marisa K. Cabrera
Assistant Federal Defender
Federal Defenders of New York

Cc:  AUSA Thomas McKay (via ECF)